Ivan Curtis CHARLES, Petitioner–Appellant,

v.

R.Q. HICKMAN, Warden;* Attorney General for the State of California, Respondents–Appellees.

No. 99–17063.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 16, 2000

Filed Oct. 3, 2000

---

government from attempting to influence the sentence, but only from suggesting a specific sentence).

* R.Q. Hickman, Warden, is substituted for his predecessor Ivalee Henry, Warden, California Department of Corrections at Ione, California. Fed. R.App. P. 43(c)(2).

Ann McClintock, Assistant Federal Defender, Sacramento, California, for the petitioner-appellant.

Morris Beautus, Deputy Attorney General, San Francisco, California, for the respondents-appellees.

Before: SCHROEDER, HAWKINS and FISHER, Circuit Judges.

FISHER, Circuit Judge:

■ California state prisoner Ivan Curtis Charles appeals the district court's denial of his § 2254 petition.[1] Charles is

1. Charles filed his habeas petition on April 18, 1996, six days before the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), so the pre-AEDPA standards apply to the merits of the petition. *See Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059,

currently serving a life sentence without the possibility of parole after being convicted in 1983 of first-degree murder with special circumstances for shooting Gerald Darnell Mitchell in retaliation for his testimony against Charles in a 1980 robbery trial. To prove Charles' retaliatory motive and that the killing was intentional and premeditated, the trial court permitted the prosecution to introduce evidence from a 1982 trial in which Charles had been charged but acquitted of stabbing Steward Bonton, who had also testified against Charles in the earlier robbery trial. The district court rejected Charles' claim here that admitting evidence of the Bonton stabbing violated the Fifth Amendment's prohibition against Double Jeopardy, applicable to the states under the Fourteenth Amendment. We agree with the district court and affirm.

### *Factual and Procedural Background*

### 1. The 1980 Robbery

On January 11, 1980, Charles and Steward Bonton committed an armed robbery at an Arco station. Gerald Darnell Mitchell, Elaine Williams and two other individuals were in the car Bonton and Charles used for their escape. Mitchell told detectives that Charles was involved in the robbery. Mitchell and Williams also testified at Charles' preliminary hearing. When Bonton was arrested, he told police that Charles was the one who held the gun during the robbery. Charles pled guilty to robbery and assault with a deadly weapon. He received the maximum six-year Youth Authority commitment, but was released in January 1982 after approximately two years of confinement.

### 2. The 1982 Stabbing of Steward Bonton

In August 1982, Charles stabbed Bonton. Although Charles admitted stabbing Bonton, his motive for doing so was disputed. The stabbing occurred on a day when Charles, Bonton, Bonton's girlfriend, Brenda Hill, and another woman had been driving around Vallejo, drinking and taking drugs. According to the California Court of Appeal:

> Apparently Hill and Bonton quarreled. At some point they went out to Sandy Beach Road in Vallejo and stopped the car. After Bonton got out of the car he felt a sharp pain in his back. He turned around and [Charles] was holding a knife. Bonton ran away. Hill testified [Charles] licked blood off the knife and said "All snitches have to die."

Charles, however, contended that he stabbed Bonton in defense of himself and Hill. By Charles' account, Bonton had been twisting Hill's arm and punching her. Although Charles initially did nothing, when they stopped the car and Bonton tried to pull Hill out of the car, Charles tried to intervene. Charles got out of the car, and Bonton let go of Hill but then tried to grab her again. At this point, Charles told him to stop. In response, Bonton allegedly pushed Charles up against the car and threatened him. Only then, Charles asserts, did he stab Bonton. Charles was charged with the stabbing, but a jury acquitted him.

138 L.Ed.2d 481 (1997). His appeal was filed after the effective date of AEDPA, however, so he must obtain a certificate of appealability ("COA") before we can exercise jurisdiction over the appeal. *See Slack v. McDaniel,* 529 U.S. 473, ——, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000). Consistent with *Slack,* we treat Charles' notice of appeal in this case as an application for a COA. *See id.; Schell v. Witek,* 218 F.3d 1017, 1021 n. 4 (9th Cir.2000) (en banc).

AEDPA permits a court to issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To meet this "modest standard," the petitioner "must demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." *Lambright v. Stewart,* 220 F.3d 1022, 1024–25 (9th Cir. Aug.4, 2000) (citations and internal quotation marks omitted). We conclude that Charles has met this standard, and we therefore grant the COA and exercise jurisdiction over his appeal.

### 3. The 1983 Murder of Gerald Darnell Mitchell

The California Court of Appeal's opinion adequately sets forth the opposing views of this incident:

[Charles] was driving around with Art Cano and Dwayne Fambles. They were drinking heavily during this period. Fambles either gave [Charles] a small black gun or put it underneath the front seat of the car. The three then went to an after-hours party at Mack Jefferson's. Mitchell was also at the party.

Cano, Fambles and Monica Williams left the party to give someone a ride home. [Charles] stayed behind at the party. At this point accounts differ as to what happened.

Fambles, Cano and Monica Williams said when they came back they saw [Charles] and Mitchell talking on the sidewalk. Fambles said he told [Charles] to get in. [Charles] said "hold down." Fambles heard at least two shots and then [Charles] jumped into the car. Williams also heard two "pop" noises, and saw a body on the ground with [Charles] standing over it. She saw [Charles] shoot again.

Cano testified he heard bits and pieces of the conversation between [Charles] and Mitchell. Mitchell told [Charles] he "should not try to work him like that" and [Charles] said "He shouldn't snitch or something like that." Mitchell was backing up during this time. He said "Let's start new." [Charles] said "Here's what I think about starting new" and shot Mitchell. He fell to the ground and [Charles] shot him two more times.

Two other witnesses testified they saw a big guy pushing around a little guy. A third said he heard [Charles] call Mitchell a snitch.

The testimony was also in conflict as to what [Charles] said when he got into the car. Williams said [Charles] also claimed he had "one more bitch to get" and that he shot Mitchell and sliced Bonton because they had snitched.

Fambles said [Charles] said something about Mitchell being a snitch. Cano said [Charles] stated he's already gotten one before this guy and had one more to get.

[Charles] testified he was drunk the night of the shooting. He went outside and was approached by Mitchell. Mitchell, who was a much larger man than [Charles], threatened to beat him up for calling him a snitch. [Charles] tried to get away but Mitchell grabbed him and began choking him. [Charles] pulled out the gun and fired. Mitchell fell back and [Charles] fell to his knees. He fired two more times.

[Charles] panicked and left in the car. He denied calling anyone a snitch. He went back to his house to try to plan an alibi. Later he turned himself into the police.

The prosecution's theory at trial was that Charles had killed Mitchell in retaliation for Mitchell's testifying against Charles about the 1980 robbery. In addition to the testimony summarized above, the prosecution obtained leave to present evidence that Charles had previously stabbed Bonton in retaliation for Bonton's testifying against Charles about the 1980 robbery. Bonton testified about being stabbed and expressed ignorance as to why the attack occurred. Brenda Hill testified that, after stabbing Bonton, Charles said, "All snitches have to die," and licked Bonton's blood off the knife for emphasis. The prosecution argued that the evidence from the Bonton stabbing was relevant to prove motive, intent and premeditation with respect to the Mitchell murder, the theory being that Charles was out for revenge against everyone who had snitched on him regarding the 1980 robbery. As the California Court of Appeal noted, "[i]t showed [Charles] was angry with those who had snitched on him and suggested he was willing to perform violent acts in revenge."

Charles took the stand and presented his version of the events surrounding the

stabbing. He testified that he stabbed Bonton because Bonton was beating up Brenda Hill. Charles specifically denied licking the blood off the knife or saying anything about snitches after the stabbing.

### Standard of Review

■ We review de novo a district court's decision to grant or deny a § 2254 petition. *Houston v. Roe,* 177 F.3d 901, 905 (9th Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1168, 145 L.Ed.2d 1078 (2000). "The applicability of collateral estoppel and its relationship to double jeopardy involve issues of law reviewed de novo." *United States v. Seley,* 957 F.2d 717, 720 (9th Cir.1992).

### Discussion

■ The rule of collateral estoppel in criminal cases is "embodied in the Fifth Amendment guarantee against double jeopardy." *Ashe v. Swenson,* 397 U.S. 436, 445, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970). Collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443, 90 S.Ct. 1189; *see also Dowling v. United States,* 493 U.S. 342, 348, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990) (clarifying that the prior acquittal must have determined an ultimate issue presented in the subsequent trial); *Santamaria v. Horsley,* 133 F.3d 1242, 1244–45 (9th Cir.) (en banc), *cert. denied,* 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998). *Ashe* involved the robbery of six men at a poker game. When Ashe was tried on a charge of robbing one of the six men, the evidence that Ashe was one of the robbers was weak and the jury acquitted him. In a subsequent trial for the robbery of another of the six card players—this time with stronger identification evidence—Ashe was convicted. The Court overturned the conviction as barred by collateral estoppel, concluding that the "single rationally conceivable issue in dispute [in the first trial] was whether the petitioner had been one of the robbers. And the jury by its verdict found that he

had not." *Id.* at 445, 90 S.Ct. 1189. Because the first jury had found that Ashe had not been present at the robbery, the only way he could be convicted was if the second jury found directly to the contrary. Consequently, the collateral estoppel rule prohibited his second prosecution. *See id.* at 446–47, 90 S.Ct. 1189.

The Supreme Court in *Dowling* subsequently held that, if a defendant is acquitted of Crime X, collateral estoppel does not bar the introduction of evidence of Crime X in a subsequent trial for Crime Y if the issue of whether the defendant committed Crime X is governed by a lower standard of proof in the trial for Crime Y. *See* 493 U.S. at 348–49, 110 S.Ct. 668. Dowling was charged with bank robbery, but his first trial ended in a hung jury and his conviction in his second trial was overturned on appeal. Before the third trial began, Dowling was arrested and tried for a separate burglary. In this separate trial, Dowling was accused of entering the house of Vena Henry, wearing a knitted mask with cutout eyes and carrying a small handgun. He was accompanied by a second man named Delroy Christian. Mrs. Henry testified that, during the burglary, a struggle ensued and she unmasked Dowling. Despite that evidence, the jury acquitted Dowling of the burglary.

Subsequently, at the third trial for the bank robbery, the government called Mrs. Henry to testify about the burglary for two purposes:

> First, it believed that Henry's description of Dowling as wearing a mask and carrying a gun similar to the mask worn and the gun carried by the robber of the First Pennsylvania Bank strengthened the Government's identification of Dowling as the bank robber. Second, the Government sought to link Dowling with Delroy Christian, the other man who entered Henry's home [and who allegedly had driven the getaway car at the bank robbery].

*Id.* at 345, 110 S.Ct. 668.

■ The Supreme Court held that this evidence was not barred by collateral es-

toppel. The Court assumed Dowling's acquittal established that there was reasonable doubt as to whether he was the masked man that entered Mrs. Henry's home. "But to introduce evidence on this point at the bank robbery trial, the Government did not have to demonstrate that Dowling was the man who entered the home beyond a reasonable doubt...." *Id.* at 348, 110 S.Ct. 668. At the bank robbery trial, the evidence of the burglary was introduced under Federal Rule of Evidence 404(b), which allows evidence of prior similar bad acts to show a pattern from which "the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Id.* (internal quotation marks omitted). "Because a jury might reasonably conclude that Dowling was the masked man who entered Henry's home, even if it did not believe beyond a reasonable doubt that Dowling committed the crimes charged at the first trial, the collateral-estoppel component of the Double Jeopardy Clause is inapposite." *Id.* at 348–49, 110 S.Ct. 668. The Court held that the case fell within the rule that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Id.* at 349, 110 S.Ct. 668. In *Seley,* we explained this distinction between *Ashe* and *Dowling:*

> *Dowling* did not alter *Ashe* so much as it introduced a new perspective on the meaning of the "ultimate fact" decided in the first trial. Instead of meaning that certain acts did not happen, an acquittal means that they were not proved beyond a reasonable doubt. If an act that could have been proved to a lesser degree than that required for conviction is for some reason probative in a subsequent trial, it need not be excluded because of the prior acquittal.

957 F.2d at 723.

■ Charles' case presents a similar circumstance. Evidence that Charles stabbed Bonton in retaliation for Bonton's having snitched on him regarding the 1980 robbery was relevant to show that Charles shot Mitchell, not in self-defense, but rather in retaliation for Mitchell's also having snitched on him regarding the 1980 robbery. The prosecution presented the evidence of the Bonton stabbing under California Evidence Code § 1101, which like Federal Rule of Evidence 404(b) permits introduction of "evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, ... ) other than his or her disposition to commit such an act." Evidence of the Bonton stabbing admitted under § 1101 did not need to be proved beyond a reasonable doubt, but rather by a preponderance of the evidence. *See People v. Carpenter,* 15 Cal.4th 312, 63 Cal.Rptr.2d 1, 40, 935 P.2d 708 (1997); *People v. Medina,* 11 Cal.4th 694, 47 Cal. Rptr.2d 165, 204–05, 906 P.2d 2 (1995). Because the issue of Charles' motive in the Bonton stabbing was governed by a lower standard of proof in the subsequent murder trial than in the original stabbing trial, the government was not precluded from relitigating the issue. A jury could have believed that Charles more likely than not stabbed Bonton in retaliation for snitching, yet not believed it beyond a reasonable doubt. Accordingly, the evidence was not barred by the collateral estoppel rule.

■ Charles misunderstands the effect of his acquittal in the Bonton stabbing. He argues that, because he admitted to the stabbing, the "sole factual dispute" was whether the stabbing was retaliatory or whether it was in self-defense or in the defense of Hill. He argues it was his burden at the 1982 trial to prove self-defense or defense of others by a preponderance of the evidence. Therefore, his acquittal of the Bonton stabbing had to mean not only that the jury in that case was unable to conclude beyond a reasonable doubt that his stabbing of Bonton was retaliatory, but also that Charles had proved by a preponderance of the evidence that he acted in defense of himself or of Brenda Hill. He has offered no evidence, however, that the

jury at the Bonton stabbing trial was instructed that he had the burden to prove his alleged defense by a preponderance of the evidence. It is highly unlikely that any such instruction was given, because it would be contrary to California case law, which states that defenses such as self-defense and defense of others negate the culpability for a crime, and thus "go[ ] directly to guilt or innocence." *People v. Adrian,* 135 Cal.App.3d 335, 185 Cal.Rptr. 506, 510 (1982). "On matters directly going to guilt or innocence, the burden of persuasion is on the state." *Id.* (citing Cal. Pen.Code § 1096 (beyond reasonable doubt standard)).[2]

At the stabbing trial, the prosecution had to prove Charles' retaliatory motive beyond a reasonable doubt; it only had to prove it by a preponderance of the evidence at the murder trial. Consequently, the evidence was not barred by the collateral estoppel component of the Double Jeopardy Clause.

AFFIRMED.

---

**2.** The defense of necessity, in contrast, is an affirmative defense that the defendant must prove by a preponderance of the evidence. *See People v. Kearns,* 55 Cal.App.4th 1128, 64 Cal.Rptr.2d 654, 657 (1997). There is no evidence that Charles put on a necessity defense or that the jury in the stabbing trial was actually instructed on or found in his favor on that defense.