Filed 12/2/15  P. v. Pendo CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JACOB PENDO<br><br>    Defendant and Appellant. | H041714<br>(Monterey County<br>Super. Ct. No. SS141065A) |

On June 2, 2014, the Monterey County District Attorney filed an information in which he charged appellant with felony vandalism (Pen. Code, § 594, subd. (b)(1));[1] "interference with" a wireless communication device, a misdemeanor (§ 591.5); and public intoxication, a misdemeanor (§ 647, subd. (f)).

On October 27, 2014, the court dismissed the public intoxication count on the prosecutor's motion.  On October 29, 2014, a jury found appellant guilty of the remaining counts.

On December 2, 2014, the trial court sentenced appellant to the low term of 16 months, to be served in the county jail pursuant to section 1170, subdivision (h).[2] Appellant filed a timely notice of appeal on December 4, 2014.

---

[1] All further statutory section references are to the Penal Code unless otherwise indicated.

[2] At sentencing, the court indicated that it was inclined to place appellant on probation, but appellant's counsel said he "would not accept a grant of probation."

On appeal, appellant raises only one issue. Specifically, he argues that the trial court erred in failing to instruct the jury sua sponte on the necessity defense; or in the alternative, his trial counsel was ineffective in failing to make a request that the court instruct the jury on that defense.

*Facts Adduced at Trial*

Laura Pendo, appellant's mother, testified that appellant lived in her home in Moss Landing. Appellant drank wine, although Mrs. Pendo had asked him not "to drink a bunch of wine." She kept box wine in the house for cooking. Mrs. Pendo owned three cars: a GMC truck, a 2010 Camaro, and a 1968 Camaro. She testified that in the months before April 2014, appellant "was constantly yelling at [her] and telling [her] that [her] car was all weird and wrong and things were wrong with it, and [she] just kept telling him that it was fine, leave the car alone."

On April 15, 2014, Mrs. Pendo planned to go to the landfill with her husband. Repeatedly, appellant asked her to buy him a bottle of wine, but she refused. She said there was wine in the house. When Mrs. Pendo and appellant's father returned from the landfill shortly before 12:00 noon, they saw that there was a lock on their gate that had not been there up to that time. Appellant was sitting on the other side of the gate. Appellant asked if they had bought him wine, and they said they had not. Mrs. Pendo thought that appellant had been drinking. When Mrs. Pendo asked appellant to take the lock off the gate, he said, "You don't live here. Locked. My house." Mrs. Pendo broke the lock with a hammer.

Mrs. Pendo walked back to her truck to get her things as her husband walked in the gate. Appellant came to the open door of the truck and "kind of flew" at her and started "yelling." She said she was sitting in the truck gathering her things when appellant grabbed the top of the truck and "came in with his feet at" her. Appellant was "yelling" at her about the wine and her car "and just things." Mrs. Pendo told appellant

2

to leave her alone; she said she would call the sheriff. Appellant walked toward the house. Mrs. Pendo thought that appellant "had been drinking a bunch of wine."

Mrs. Pendo got out of the truck after appellant went into the house. Her husband was already inside the house. Mrs. Pendo heard "yelling and things banging" coming from inside the house, so she walked away from the house and called 911 on her cellular telephone. From the position in which she was standing making the 911 call Mrs. Pendo could not see her driveway. As she was speaking to the 911 operator, appellant came up to her and grabbed the telephone from her hand. "Then he just lit off and started cussing that lady out." As Mrs. Pendo walked away, "the phone went fling [*sic*] down the road." She said that she "could see little pieces flying everywhere." Mrs. Pendo saw appellant throw the telephone. She testified that she "was kind of scared." When she returned to her house, her husband pulled back the tarp that had been covering the 1968 Camaro. She could see the damage that had been done to the car's roof.

Mrs. Pendo obtained at least two estimates of the cost to repair the Camaro. Both estimates were close to $5,000. She testified that she had not driven the car for "a while" before April 15, 2014, because on one occasion when she had to brake suddenly, one of her rear brakes locked up and she wanted to have it looked at. She had asked her older son to look for parts. She explained, "so I just had it basically parked. I wasn't driving it." She said that she had not "driven the car for quite a while since the brakes had done that." Mrs. Pendo had last looked at the car a week or two before April 15. However, before she had stopped driving the car, appellant had told her that he thought it was unsafe.

On cross-examination, when asked if appellant was "yelling" about the Camaro, Mrs. Pendo testified, "At that point I don't think he was on the car. He was just yelling at me in this area and, you know, I was yelling at him about locking us out."

John Pendo, appellant's father, testified that on the morning of April 15, 2014, appellant was drunk. He explained that appellant "demanded that we buy him some wine

3

because the box wine in the house wasn't good enough." As he and his wife left for the landfill, appellant continued to demand that they buy him wine. Mr. Pendo could not say if appellant was angry at the time. "He appeared mostly drunk." Mr. Pendo confirmed that when they returned from the landfill, appellant was sitting behind the locked gate. Appellant asked if they had brought him wine. Mr. Pendo testified that when he told him no, appellant "became irate with us and started saying things like he was homesteading the place and evicting us."

Once the gate was open Mr. Pendo went into the house. According to Mr. Pendo, when he went to the refrigerator, appellant "came charging in the door, ripped off the animal guard, and charged [him] into the refrigerator knocking over a glass, and disturbing the table and chairs, apparently trying to get" appellant's father "to hit him or something, yelling." Appellant said his parents were "stupid" not to get him the wine and that "he'd show [them]." Mr. Pendo ignored appellant and then appellant went back outside. Mr. Pendo said appellant was saying "[c]razy stuff about he was in charge now, that we should have brought him wine."

Mr. Pendo did not follow appellant outside because he was "[t]rying to hide from" appellant. He heard appellant "yelling" at Mrs. Pendo. When Mr. Pendo looked out of the window, he saw appellant "in her face just yelling at her." Mr. Pendo was afraid if he went outside, "it just would agitate [appellant] more." Mr. Pendo said, "I've seen this before. And as long as you don't react to him, sometimes he calms down."

When the commotion stopped, Mr. Pendo looked out of the window again. He saw that his wife was in the street on her telephone, and appellant "was on top of the '68 Camaro jumping up and down." As appellant jumped up and down on the roof of the Camaro he was "screaming and yelling at the same time and flailing his arms." After appellant got off the car, Mr. Pendo saw appellant walk toward his wife on the street. When Mr. Pendo went outside and looked at the roof of the car under the tarp, he saw

4

that it was "caved in." Mr. Pendo could see appellant "yelling" at his wife on the street, so he started walking toward appellant.

John Fernandez owned a company that worked on cars. He went to the Pendos' residence to estimate the damage to the Camaro. He found that the "whole roof was crushed in." Fernandez gave the Pendos an estimate of $4,994 to repair the Camaro. Other than the damage to the roof, the car did not look unusual nor did it look as if it had been pieced together from different parts.

Appellant testified in his own defense. He said that, while washing his mother's 1968 Camaro, he noticed that under the car there were "self-tapping bolts holding the leaf springs to the body." Based on his review of a manual for the vehicle, he thought the parts were not correct and that they rendered the car unsafe. Appellant described the car as a "lame horse", and "a chop shop car." Other than reading the manual, appellant's only experience or training in the automotive field was an auto body class he took in high school. However, he said that he had "been around cars all [his] life."

Appellant explained that he had been concerned about the Camaro for six weeks before April 15, 2014, but no one would look under the car. Appellant said that he jumped on the car on April 15 to damage it so that someone would examine the car to determine whether it was safe. Appellant explained, "Seeing the condition of the car, it's almost as if my mother had brought home a lame horse, and I was just putting the horse down, basically." Appellant denied that he was upset that day because his mother did not bring him wine. In addition, he denied that he ripped off the screen door. He said that "Basically, [he] slammed the door. They were self-tapping little screws. Same thing as the bolts underneath holding the leaf springs. When I slammed the door, those little short self-tapping screws ended up popping out. The screen just fell off."

The jury deliberated for just over an hour before returning its verdict.

5

*Discussion*

Appellant argues that the trial court erred in failing to instruct on the necessity defense in violation of the federal Constitution and California law.

"The necessity defense has been recognized in appellate court decisions in California despite the absence of any statutory articulation of this defense and rulings from the California Supreme Court that the common law is not a part of the criminal law in California. [Citation.]" (*People v. Garziano* (1991) 230 Cal.App.3d 241, 242.)

CALCRIM No. 3403 articulates the elements of the necessity defense. Specifically, CALCRIM No. 3403 provides in pertinent part, "The defendant is not guilty of *<insert crime[s]>* if (he/she) acted because of legal necessity. [¶] In order to establish this defense, the defendant must prove that: [¶] 1. (He/She) acted in an emergency to prevent a significant bodily harm or evil to (himself/herself/ [or] someone else); [¶] 2. (He/She) had no adequate legal alternative; [¶] 3. The defendant's acts did not create a greater danger than the one avoided; [¶] 4. When the defendant acted, (he/she) actually believed that the act was necessary to prevent the threatened harm or evil; [¶] 5. A reasonable person would also have believed that the act was necessary under the circumstances; [¶] AND [¶] 6. The defendant did not substantially contribute to the emergency. [¶] The defendant has the burden of proving this defense by a preponderance of the evidence. This is a different standard of proof than proof beyond a reasonable doubt. To meet the burden of proof by a preponderance of the evidence, the defendant must prove that it is more likely than not that each of the six listed items is true."

Thus, "[t]o justify an instruction on the defense of necessity, there must be evidence sufficient to establish that defendant violated the law (1) to prevent a significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially

6

contribute to the emergency. [Citations.]" (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.)

Nevertheless, a trial court's duty to instruct, sua sponte, or on its own initiative, on a particular defense arises " 'only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*People v. Barton* (1995) 12 Cal.4th 186, 195.)

Appellant argues that his testimony, corroborated by his mother's testimony, provided substantial evidence to support a necessity defense. We disagree. The factual predicate for appellant's claim of necessity is insufficient as a matter of law to establish at least two elements of that defense. Viewing the evidence in the light most favorable to appellant, no exigent circumstance required him to take the action that he took and there was a reasonable legal alternative to vandalizing the Camaro.

Regarding the necessity defense, "a well-established central element involves the emergency nature of the situation, i.e., the imminence of the greater harm which the illegal act seeks to prevent. [Citation.] The commission of a crime cannot be countenanced where there exists the possibility of some alternate means to alleviate the threatened greater harm. [Citation.]" (*People v. Patrick* (1981) 126 Cal.App.3d 952, 960, fn. omitted.) In other words, there must be a showing of imminence of peril before the defense of necessity is applicable. A defendant is not entitled to a claim of necessity unless and until he demonstrates that given the imminence of the threat, violation of the law was the only reasonable alternative. (*United States v. Bailey* (1980) 444 U.S. 394, 411.)

Here, there was no evidence that appellant acted in an emergency to prevent significant evil. In essence, appellant claims that he wanted to prevent his mother from driving the Camaro because he thought it was unsafe. However, Mrs. Pendo testified that she had not driven the car for several weeks, as her older son was looking for parts for the

7

car after she had experienced problems with the brakes. She testified that she had parked the car and was not driving it, and the car was just "sitting." Since appellant lived with his mother and father, he would have been aware that his mother was no longer driving the 1968 Camaro.

Furthermore, one important underlying premise of the necessity defense is that " ' if there was a reasonable, legal alternative to violating the law, "a chance both to refuse to do the criminal act and also to avoid the threatened harm," the defense[] will fail.' [Citation.]" (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.) Plainly, here there was such a reasonable legal alternative. Appellant could have disabled the Camaro without vandalizing it—he could have taken away his mother's keys, removed the spark plugs, removed the wheels, disengaged and removed the battery, or even enlisted his father's help in persuading his mother not to drive the Camaro.

Since appellant's testimony did not support at least two elements of the necessity defense, and there was no other testimony to support these elements, the trial court had no sua sponte duty to instruct on the defense. (*People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135 (*Kearns*), [evidence was insufficient to permit a reasonable jury to find that all elements of the necessity defense were established and thus the trial court did not commit error in failing to instruct].)

In the alternative, appellant argues that his trial counsel was ineffective in failing to request an instruction on the necessity defense.

A criminal defendant has a right to the assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 684-685 (*Strickland*).) This right "entitles the defendant not to some bare assistance but rather to effective assistance." (*People v. Ledesma* (1987) 43 Cal.3d 171, 215 (*Ledesma*), italics omitted.) "To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more

favorable determination would have resulted in the absence of counsel's failings. [Citations.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 288.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, *supra*, at p. 694.)

Thus, to prevail on an ineffective assistance of counsel claim, appellant must establish two things: (1) the performance of his or her counsel fell below an objective standard of reasonableness, *and* (2) prejudice occurred as a result. (*Strickland*, *supra*, 466 U.S. at p. 687; *People v. Hernandez* (2012) 53 Cal.4th 1095, 1105.)

"A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) Where the record on appeal "does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation." (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

We find that it was objectively reasonable for trial counsel not to request an instruction on the necessity defense.[3] We have no doubt that in this case trial counsel recognized that the necessity defense could not be established on the facts presented. To put it simply, we have no doubt that trial counsel was aware that the defense could not be proved even by a preponderance of the evidence because the evidence did not support at least two elements of the defense—no exigent circumstance required appellant to take the action that he took and there was a reasonable legal alternative to vandalizing the Camaro. As such, appellant's claim of ineffective assistance does not overcome the first

---

[3] Defense counsel's argument to the jury plainly shows that she was attempting to convince the jury that when appellant jumped on the car, his intent was not to try to injure or annoy his mother or father, as would be required for vandalism. Vandalism required a showing that appellant had acted maliciously, i.e., by intentionally doing a wrongful act or acting with the unlawful intent to annoy or injure someone else. (See CALCRIM No. 2900.)

prong of the *Strickland* test. (*Kearns*, *supra*, 55 Cal.App.4th at p. 1135, [evidence was insufficient to permit a reasonable jury to find that all elements of the necessity defense were established and thus counsel did not commit error in failing to request an instruction]; *People v. Garvin* (2003) 110 Cal.App.4th 484, 489-490, [rejecting defendant's contention that counsel was ineffective in failing to request an instruction when there was a reasonable tactical decision not to do so; even cursory review of the record reveals an obvious tactical reason for the omission].)

In sum, we find no merit in appellant's claim that the trial court erred in failing to instruct on the necessity defense. Similarly, we find no merit in his claim of ineffective assistance of counsel.

*Disposition*

The judgment is affirmed.

_____

ELIA, ACTING P.J.

WE CONCUR:


_____

BAMATTRE-MANOUKIAN, J.



_____

MIHARA, J.



*The People v. Pendo*
H041714