*1131
 
 Opinion
 

 McKINTYRE, J.
 

 Happy Germaine Kearns was arrested for, and admitted her participation in, four robberies. At trial, Kearns asserted that she was forced, under threats against her life, to commit the crimes. The jury convicted Kearns of robbery and commercial burglary charges arising from three of the four incidents. She appeals, contending the trial court erred in (1) denying her motion for new trial based on newly discovered evidence; (2) failing to instruct the jury, sua sponte, regarding the defense of necessity; (3) refusing her proffered pinpoint instructions on the defense of duress; and (4) excluding certain evidence relating to the person who forced her to commit the crimes. Kearns also asserts that her counsel’s failure to request an instruction on the necessity defense constitutes ineffective assistance. Finally, she contends the case must be remanded for correction of clerical errors in the abstract of judgment. The People concede that correction of the abstract of judgment is appropriate and we so order. Otherwise, we affirm the judgment.
 

 Factual and Procedural Background
 

 A.
 
 The Prosecution’s Case
 

 1.
 
 Robbery of 7-Eleven Convenience Store (Counts 1 and 5)
 

 In the evening of May 3, 1995, Kearns walked into a 7-Eleven convenience store in Escondido and demanded that cashier Sharon Lopez-Mares turn over the money from the cash register. Kearns’s hand was in her pocket and Lopez-Mares assumed that she was holding a gun. After Lopez-Mares opened the register drawer, Kearns removed the bills and then walked slowly out of the store. Lopez-Mares testified that Kearns did not appear to be injured or scared during the robbery, which was videotaped on the store’s surveillance camera.
 

 2.
 
 Robbery of Circle K Convenience Store (Counts 2 and 6)
 

 Patricia Barnes was working alone at a Circle K convenience store in Vista at 10:35 p.m. on May 23, 1995, when Kearns entered and asked for change for a quarter. Barnes opened the register and saw that Kearns was holding a gun. Kearns pulled back the slide of the gun, showing that it had bullets in the chamber, and instructed Barnes “give me the rest of your money.” Barnes complied. At trial, Barnes testified that Kearns did not appear to be nervous during the robbery or show signs that she was injured or in pain.
 

 
 *1132
 
 3.
 
 Robbery of Unocal 76 Gas Station (Counts 3 and 7)
 

 At approximately 9 p.m. on June 1, 1995, Arthur Doherty was working as a cashier at a Unocal 76 gas station in San Marcos. As Doherty stepped out of his booth, a car pulled up beside it; Kearns got out of the car, showed Doherty a gun and demanded money. Kearns followed Doherty back into the booth, where Doherty opened the cash drawer and Kearns removed the bills. Kearns also picked up a roll of quarters, which she dropped while looking into the drawer for more bills. When she bent down to pick up the spilled quarters, she told Doherty “turn around, motherfucker.” Kearns left the booth and Doherty saw the car move away; he observed that the car was driven by an African-American male in his late 20’s, but was unable to see any other occupants. Doherty took down the license number of the car and reported it to police. Doherty testified that Kearns appeared calm throughout the ordeal.
 

 4.
 
 Robbery of Subway Sandwich Shop (Counts 4 and 8)
 

 At 9:30 p.m. on June 1, 1995, Kearns entered a Subway sandwich shop in Vista, holding a gun, and demanded money from Daniel Chiariello, who was working alone at the shop. Chiariello handed Kearns the bills from the cash register and she left. Chiariello testified that Kearns appeared to be in a hurry.
 

 B.
 
 The Defense Case
 

 Kearns was an 18-year-old methamphetamine addict at the time of the crimes. She had moved out of her parents’ home and was selling cocaine to support herself. She testified that, during the spring of 1995, she was raped and, on a number of occasions, threatened and beaten by Lemont Scott. On one occasion, Scott forced Kearns to get into a car with him and another man, Terry Davis; Scott put a gun to her head and told her that he would kill her if she did not do as he instructed. Davis drove them to the 7-Eleven store, where Scott gave Kearns a piece of wood and told her to put it in her pocket so that it would look like she had a gun. Kearns complied and robbed the store. When Kearns walked out of the store, she tried to run away, but Scott caught her and made her get back into the car. The men dropped Kearns off and kept all of the stolen money.
 

 Kearns moved in with a friend, June Floyd, in an attempt to avoid Scott. She did not tell Floyd about the incident because Scott had threatened to kill
 
 *1133
 
 her if she said anything to anyone. She did not encounter Scott again until May 23, when he appeared at Floyd’s home looking for her. Scott slapped Kearns and pushed her into the car. Davis drove them to Scott’s apartment and Davis and Kearns waited while Scott ran an errand. After Scott returned, they drove around. Scott pointed out potential robbery sites, but Kearns refused to commit any crime until Scott hit her on the head with his gun; she then agreed to rob the Circle K store. Scott gave Kearns an inoperable gun, which Kearns used to commit the robbery. Afterward, they went to a Motel 6 where the men split the money and Scott again raped Kearns. The next morning, Kearns returned to Floyd’s house, still carrying the broken gun.
 

 Kearns gave the broken gun to Scott’s friend, “Tick,” who said he could repair it. On June 1, Scott returned to Floyd’s house looking for Kearns after Tick denied having the gun. Floyd tried to protect Kearns, but the men continued to make threats against Kearns. Kearns was scared, so she went with them to the apartment of Scott’s friend, Shelley McMurray, where Scott beat Kearns and accused her of stealing his gun. Scott told Kearns she was going to pay him back for the gun and forced her to get back into the car with him and Davis. They drove to the Unocal 76 station, where Scott gave Kearns his gun, but made her remove the bullets. Kearns testified that Scott shouted instructions to her as she was carrying out the robbery. Afterward, Scott told Kearns that they had not gotten enough money to cover the cost of the gun and that she would have to commit one more robbery. Kearns objected and Scott hit her. They stopped at the Subway sandwich store and Scott told Kearns, “[j]ust go do it. It’s the last one. I promise you’ll never [have to] do anything for me again.” Kearns testified, “I liked the sound of that so I did go do it.”
 

 Kearns testified that she thought Scott would kill her if she refused to commit any of the robberies. She also stated that she was under the influence of methamphetamine and alcohol, and felt “carefree” as a result, during each of the robberies. Dr. Nancy McTigue testified that Kearns subjectively believed she was in danger from Scott and that she acted because of her isolation and Scott’s intimidation and domination, similar to a victim of battered woman’s syndrome.
 

 Kearns also called Sonja McNutt, who testified that Scott and Kearns, sometimes in the company of others, would come to her home. On every occasion, she witnessed Scott verbally and physically abusing Kearns, which would cause Kearns to jump up “in a panic state” and be ready to “go wherever or [do] whatever he wanted.” Once, she overheard Scott saying that he had used Kearns to commit robberies. Two other witnesses, Shalena
 
 *1134
 
 Tabor and Rochelle Pochinko, testified that Scott had verbally and physically abused them and forced them to commit robberies or thefts for him.
 

 Kearns unsuccessfully sought to locate Floyd to testify at trial.
 

 C.
 
 The Verdict and Sentence
 

 The jury acquitted Kearns of the robbery and commercial burglary charges relating to the holdup of the 7-Eleven store, but convicted her of all remaining counts. The court sentenced Kearns to eight years four months on the robbery charges, staying sentence on the related commercial burglary charges, and recommended that she be placed in the custody of the California Youth Authority.
 

 Discussion
 

 I.
 
 Denial of Motion for New
 
 Trial
 
 *
 

 II.
 
 Failure to Introduce the Necessity Defense
 

 In its trial brief, the prosecution argued that a necessity defense was not available on the facts presented. Defense counsel did not seek an instruction regarding necessity, but asked to have the court instruct the jury regarding duress.
 
 [1]
 
 In the motion for new trial, however, defense counsel asserted that the trial court had a duty to instruct the jury, on its own motion, regarding a necessity defense and that, even in the absence of a such a duty, his own failure to seek such an instruction constituted ineffective assistance of counsel. Kearns reasserts these arguments on appeal. Like the trial court, we find them unavailing.
 

 Except as to crimes that include lack of necessity (or good cause) as an element, necessity is an affirmative defense recognized based on public
 
 *1135
 
 policy considerations.
 
 (People
 
 v.
 
 Dewberry
 
 (1992) 8 Cal.App.4th 1017 [10 Cal.Rptr.2d 800];
 
 People
 
 v.
 
 Heath
 
 (1989) 207 Cal.App.3d 892, 900-901 [255 Cal.Rptr. 120].) To justify an instruction on the defense of necessity, a defendant must present evidence sufficient to establish that she violated the law (1) to prevent a significant and imminent evil, (2) with no reasonable legal alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief that the criminal act was necessary to prevent the greater harm, (5) with such belief being objectively reasonable, and (6) under circumstances in which she did not substantially contribute to the emergency. (CALJIC No. 4.43;
 
 People
 
 v.
 
 Pepper
 
 (1996) 41 Cal.App.4th 1029, 1035 [48 Cal.Rptr.2d 877].)
 

 Here, Kearns’s evidence was insufficient to permit a reasonable jury to find that these elements were established and thus neither the trial court nor defense counsel committed error.
 
 (People
 
 v.
 
 Slack
 
 (1989) 210 Cal.App.3d 937, 942 [258 Cal.Rptr. 702].) Most notably, Kearns did not establish the absence of a reasonable legal alternative to committing the crimes and clearly at least one such alternative existed, to wit, asking the victim to call police rather than carrying out the robbery. Further, we find that the necessity defense is inappropriate in this case because its recognition would encourage rather than deter violence. Kearns committed a number of armed robberies and in so doing created a risk of serious bodily injury or death to each of her victims. In this situation, “[vjiolence justified in the name of preempting some future, necessarily speculative threat to life is the greater, not the lesser evil” and thus the public policy considerations on which the necessity defense is based do not support application of the defense here.
 
 (People
 
 v.
 
 McKinney
 
 (1986) 187 Cal.App.3d 583, 587 [231 Cal.Rptr. 729].)
 

 Citing CALJIC No. 4.43, Kearns contends that it is the actual harm caused by the illegal act, rather than the risk of harm reasonably anticipated therefrom, that provides the basis for the necessity defense. The language of the CALJIC instruction appears to derive from
 
 People
 
 v.
 
 Pena
 
 (1983) 149 Cal.App.3d Supp. 14 [197 Cal.Rptr. 264], in which the court outlined the elements of a “justification/duress” defense to include a requirement that “[t]he harm
 
 caused
 
 by the [illegal] act must not be disproportionate to the harm avoided . . . .”
 
 (Id.
 
 at p. Supp. 25, italics added.) However, we believe that it is the potential for harm created by the act, viewed immediately prior to the illegal act, rather than a hindsight view of the harm actually caused thereby, that is necessary to support the necessity defense.
 

 Our conclusion rests on the fact that each of the other elements of the necessity defense is measured with reference to the circumstances at, or prior
 
 *1136
 
 to, the time the defendant is faced with the alleged necessity. In this situation, measuring the illegal conduct in terms of the harm actually caused would conflict with certain of these other elements, particularly the requirements that the defendant’s belief in the necessity be in good faith and objectively reasonable under the circumstances. Additionally, we believe it to be illogical to apply the defense if the risk of harm created by the defendant’s illegal conduct, fortuitously, does not come to fruition, but decline to apply it to precisely the same conduct where the risk is fully realized. (Accord, 1 LaFave & Scott, Substantive Criminal Law (1986) Justification and Excuse, § 5.4, pp. 634-635.)
 

 For these reasons, we reject the contention that the application of the necessity defense turns on the actual harm caused rather than the harm reasonably foreseeable to arise from the illegal conduct. (See also
 
 People
 
 v.
 
 Pepper, supra,
 
 41 Cal.App.4th at p. 1035;
 
 People
 
 v.
 
 Slack, supra,
 
 210 Cal.App.3d at p. 943 [reciting the
 
 Pena
 
 elements, but finding no error in refusal to give instructions on necessity where the defendant’s conduct of driving intoxicated “placed the persons at this normally congested checkpoint and the adjacent property in danger” and created a “risk of vehicular destruction,” without any showing that the defendant’s conduct resulted in actual harm].)
 

 III.
 
 Refusal to Give “Pinpoint” Instructions on Duress
 

 At Kearns’s request, the court instructed the jury regarding the duress defense. Kearns also sought to have the court give the following special instructions regarding duress:
 

 “The defendant’s honest belief, even if mistakenly or unreasonably held, that her life would be in immediate danger if she did not engage in the conduct charged negates the criminal intent necessary to convict her of the crimes of robbery and burglary.
 

 “If the evidence raises a reasonable doubt as to whether the danger perceived by defendant negated the criminal intent[,] you must find that such intent was not formed.”
 

 And also: “If you find from the evidence that at the time the alleged crimes were committed the defendant honestly held a belief that her[] own life was in danger, you must consider what effect, if any, this belief had on the defendant and whether she formed any of the specific mental states that are essential elements of the charges, such as the specific intent to steal.
 

 
 *1137
 
 “If you have a reasonable doubt as to whether the defendant formed any required specific intent or mental state, you must give the defendant the benefit of that doubt and find that such specific intent or mental state has not been proven beyond a reasonable doubt.
 

 “The defendant’s honest belief that her life was in danger may, by itself, raise a reasonable doubt in your mind that defendant formed any of the above mental states.”
 

 Kearns contends she was entitled to these instructions to “ ‘directs attention to evidence from . . . which a reasonable doubt of [his] guilt could be engendered’ ” in accordance with
 
 People
 
 v.
 
 Hall
 
 (1980) 28 Cal.3d 143, 159 [167 Cal.Rptr. 844, 616 P.2d 826] (overruled on other grounds in
 
 People
 
 v.
 
 Bouzas
 
 (1991) 53 Cal.3d 467, 476 [279 Cal.Rptr. 847, 807 P.2d 1076]), quoting
 
 People
 
 v.
 
 Sears
 
 (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847].
 

 This argument is without merit as the proposed instructions are contrary to the law. The California Supreme Court has held that “[i]n the case of robbery, ... the unreasonable belief that a defendant is acting under duress will not negate the requisite specific intent... to deprive the owner of the property taken.”
 
 (People
 
 v.
 
 Bacigalupo
 
 (1991) 1 Cal.4th 103, 126 [2 Cal.Rptr.2d 335, 820 P.2d 559], vacated and remanded on other grounds
 
 sub nom. Bacigalupo
 
 v.
 
 California
 
 (1992) 506 U.S. 802 [113 S.Ct. 32, 121 L.Ed.2d 5].) Although Kearns contends that the holding in
 
 Bacigalupo
 
 was based on the specific facts there presented, we find no language in the decision to support this contention. Because we do not find any basis for limiting the holding of
 
 Bacigalupo
 
 as Kearns suggests, we conclude the court did not err in refusing to give the proposed instructions.
 

 IV, V
 
 *
 

 Disposition
 

 The trial court is ordered to modify the abstract of judgment in accordance with this opinion. The Department of Corrections is ordered to transfer Kearns to the custody of the California Youth Authority in accordance with
 
 *1138
 
 Welfare and Institutions Code section 1731.5, subdivision (c).
 
 [3]
 
 In all other respects, the judgment is affirmed.
 

 Work, Acting P. J., and Huffman, J., concurred.
 

 A petition for a rehearing was denied June 17, 1997, and appellant’s petition for review by the Supreme Court was denied August 27, 1997.
 

 *
 

 See footnote,
 
 ante,
 
 page 1128.
 

 [1]
 

 Venal Code section 26 sets forth the concept of duress, as follows: “All persons are capable of committing crimes except those belonging to the following classes: . . . Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.” Based on the immediacy of the situation, this defense negates a criminal intent by the person under duress, rather attributing such intent to the coercing party. (CALJIC No. 4.40.)
 

 *
 

 See footnote,
 
 ante,
 
 page 1128.
 

 [3]
 

 At her sentencing, Kearns was 18 years old and thus eligible for a transfer to the California Youth Authority under Welfare and Institutions Code section 1731.5, subdivision (c) as in effect at that time. (Stats. 1994, ch. 453, § 16 [permitting transfer of any person under age 21].) The statute has since been amended to change the maximum eligibility age to 17 years of age. (Stats. 1996, ch. 195, § 1.) The Director of Youth Authority should consider Kearns’s eligibility for transfer in accordance with the statute as in effect at the time of her sentencing.