Filed 7/11/16  P. v. Mendez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E064249 |
| v. | (Super.Ct.No. FWV1303835) |
| DAVID MENDEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Mary E. Fuller, Judge.  Affirmed with directions.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, and Allison V. Hawley, Deputy Attorneys General, for Plaintiff and Respondent.

1

# INTRODUCTION

Defendant David Mendez and his cohort, Jorge Esteban Cisneros, entered a check-cashing business where Cisneros shot the clerk in the chest while defendant seized $600 from the cash drawers as the victim lay dying. Security cameras recorded the coordinated attack. Defendant claimed Cisneros forced him to participate by threatening him at gunpoint.

The jury rejected the defense of duress and convicted defendant of premeditated murder and second degree robbery. (Pen. Code, §§ 187, subd. (a), and 211.)[1] The jury also found true, with respect to both counts, that a principal was armed with a firearm within the meaning of section 12022, subdivision (a)(l), and, with respect to count 1, that the murder was committed while engaged in the commission of a robbery within the meaning of section 190.2, subdivision (a)(17). The court sentenced defendant to life in prison without the possibility of parole.[2]

On appeal, the People agree with defendant's argument that the trial court failed to instruct the jury properly, based on CALCRIM No. 703, on the elements of the special circumstance that defendant committed the murder while engaged in the commission of a robbery, a finding that permitted the court to impose life in prison without parole. However, the People argue the error was harmless because of overwhelming evidence

---

[1] All statutory references are to the Penal Code unless stated otherwise.

[2] After being convicted, Cisneros was also sentenced to life without parole on April 14, 2016.

defendant intended to kill or was a major participant who acted with reckless indifference to human life.

Defendant next argues that the trial court failed to instruct the jury sua sponte on the defense of necessity and erred in admitting impeachment evidence and other types of incriminating evidence. We reject these contentions. Finally, the People agree with defendant that his parole revocation restitution fine should be stricken as an unauthorized sentence because defendant was sentenced to life without parole. Subject to this modification, we affirm the judgment.

## II

## STATEMENT OF FACTS

### A. *Prosecution's Evidence*

Defendant and Cisneros were good friends and coworkers at Clariant Corporation.[3] Cisneros was a gun enthusiast. Coworkers described him as aggressive and obnoxious. In April 2013, Jose Mendez, a coworker, noticed defendant and Cisneros handling a handgun in the locker room. When Jose asked them why they were "doing stupid stuff," defendant stuffed the gun in his waistband under his shirt. In rebuttal, Jose testified that, the day after Jose reported the incident to his supervisor, defendant and Cisneros confronted him. Specifically, defendant said, "Just watching here. When it's your time, it's your time." Jose reported that defendant had bullied Jose's stepson, who also worked at Clariant.

---

[3] At work, defendant was known as Johan Samayoa and Cisneros was known as Jorge Esteban.

3

Both Cisneros and defendant had asked coworkers for loans. Cisneros was struggling financially and he was a customer of Check 'n Go, a payday loan business, in Chino. The store manager, Virgil Ross, testified that, on November 14, 2013, Cisneros came into the store at closing time. Vanessa Martinez, an employee, told him he did not qualify for a modified loan. Cisneros complained to Ross, asking if Ross was "too good" to greet him. Cisneros left the store, driving a black Nissan Altima.

Defendant told a coworker he was living from paycheck to paycheck. On the morning of November 15, 2013, defendant asked another coworker if he could borrow a hundred dollars to avoid a $25 insurance late fee.

Later that day, Cisneros and defendant left work for lunch. They arrived at the Check 'n Go after 1:15 p.m. Martinez was the only employee because Ross, the manager, had left for lunch. The front door was locked, which was the business practice. Martinez was on the phone, talking with Anthony Lagos, the manager of an Upland Check 'n Go. Lagos heard Martinez scream and then a loud thump. He heard Martinez moaning in pain and two male voices speaking in Spanish. One was saying, "Over there. Over there." The other voice asked, "There?" Lagos immediately called the police on another line.

In the security videos, Cisneros approaches the door of the business and Martinez pushes a button to allow him entry as she talks on the phone. Cisneros, who is barefaced, holds the door open as defendant, wearing a mask, comes into the frame and both men move inside. With defendant behind him, Cisneros walks up to the front counter and,

4

before Martinez can take any evasive action, Cisneros fires a gun at her chest at close range. Defendant is still several feet behind Cisneros during that time.

After Cisneros fires, defendant sprints around the counter and rummages through several drawers while Cisneros remains on the other side of the counter, pointing to various locations. Martinez falls from her chair and lies on the floor, lifting her head repeatedly while defendant steps over her body to search the drawers. Cisneros then turns and walks out of the store ahead of defendant. After defendant finishes searching the drawers, he runs out of the store.

At no point does Cisneros point a weapon at defendant. Defendant does not try to leave when he is following behind Cisneros. Defendant took $600 from the cash drawers. Martinez died at the scene.

A witness in a nearby car observed defendant, wearing a blue dust mask, walk quickly around the corner of the Check 'n Go, and get into the passenger side of a black Altima. Defendant and Cisneros returned to work at around 1:45 p.m.

Ross, the store manager, identified Cisneros as the customer from the night before. Jorge Villegas, who worked with Cisneros and defendant, recognized Cisneros on the news and reported him to the police. Villegas also recognized defendant's Boston Red Sox hat and the blue mask as one they typically wore at work. Another coworker recognized defendant as the masked man in the video.

During a search of the Clariant building, officers found the handgun used in the shooting inside a cereal box. At Cisneros's work station, officers found a hat like he

5

wore in the video. In defendant's truck, officers also found a hat like defendant wore in the video.

When defendant was interviewed the day after the shooting, he denied involvement but responded, "If I were in a tough situation financially, perhaps I can do this. But I'm not. I'm financially okay." He also contended that, if he had committed such a crime, he would have fled.

In a phone call from jail to his wife, defendant recounted going to lunch with Cisneros; stopping "to do a quick job"; Cisneros cocking the hammer of the gun; entering the store; and searching the drawers. Defendant told his wife he was in the video but claimed there was little evidence against him because his face was covered. A detective testified that defendant also discussed the payment of an insurance premium with his wife.

B. *Defense Case*

One of the coworkers testified that, a few weeks before the shooting, Cisneros had borrowed $200 from him. On the day of the shooting, Cisneros and defendant invited him to join them for lunch. Defendant appeared normal all morning but seemed quiet and nervous when he returned from lunch. The afternoon of the shooting, the coworker overheard defendant talking about needing to visit Washington state.

Another coworker described Cisneros as having an unpredictable demeanor and sometimes angrily snapping at people. He saw Cisneros bring a weapon to work several times, and Cisneros's fixation on guns and violence was well-known. The coworker also

6

received phone calls from Cisneros's debt collectors. Defendant had said that he needed money.

Defendant testified in his own defense. He claimed that, at the time of the shooting, his bills were up to date, he was not in debt, and that he had not asked anyone for money. He admitted that he was the masked man in the video. Despite Cisneros's reputation, defendant regularly went out to lunch with him and played soccer with him after work.

On the day of the shooting, defendant initially declined to go to lunch with Cisneros because his wife had packed his lunch but he eventually agreed. While they were in Cisneros's car, Cisneros stopped to cash a check. Defendant asked Cisneros why he was putting on gloves. Cisneros responded that they were going to perform a "small job," a robbery, and then leave. When defendant refused to go inside, Cisneros threatened him with the gun. Cisneros forced him to wear the mask. Defendant was silent and feared for his life. Defendant refused to move until Cisneros stood behind him with the gun.

After they entered the store, there were two gunshots, and defendant grabbed the money. Once they exited, defendant ran to the car and handed Cisneros the money. Then they returned to work.

Defendant was concerned for his family's safety and afraid to report the incident. After work, he picked up a pizza and went home. He was arrested the next day. Defendant explained his denials to police by saying that he was not sure if Cisneros had

7

been detained, and he was still afraid for his family. Detective Acuna testified in rebuttal that, defendant was told in his initial interview that Cisneros was in custody.

Although defendant admitted the April 2013 incident in which he tucked a gun in his waistband, he denied that the gun belonged to him. He also denied asking a coworker for money. He knew that Cisneros was preoccupied with guns and violence. He acknowledged that he could have outrun Cisneros but he claimed he was afraid that Cisneros would shoot him in the parking lot. Defendant did not consider running away or calling for help.

Defendant also acknowledged that Cisneros held the door open for him before he entered the business and that, after the shooting, defendant immediately went behind the counter to get the money. Defendant did not call for help and he stepped on the dying victim's hair while collecting the money.

III

INSTRUCTION ON FELONY MURDER SPECIAL CIRCUMSTANCE

In an oral motion for a new trial, defense counsel noted that the trial court did not instruct the jury with CALCRIM No. 703. He explained that the prosecution had presented two theories for count 1—first degree murder based on malice and first degree felony murder—and that it was not clear on which theory the jury relied. If the jury had relied on a felony murder aiding and abetting theory, CALCRIM No. 703 would have required the jury to make findings on the special circumstance as to defendant's level of involvement and intent in committing the murder. Defense counsel further argued that, although defendant was involved in an armed robbery that resulted in death, he did not

8

necessarily have the requisite intent and involvement to support the special circumstance finding.

In response, the prosecutor argued that, unlike in cases involving a getaway driver, defendant's substantial role in these crimes was overwhelmingly clear from the videos. The prosecutor argued that defendant's conduct and use of a mask indicated planning and preparation. Defendant did not hesitate or indicate any surprise about the murder. Instead, he immediately ran to ransack the drawers. The court denied defendant's request for a new trial, finding there was no doubt defendant was a major participant.

On appeal, the People agree with defendant's argument that the trial court failed to instruct the jury properly, based on CALCRIM No. 703, that if the jury convicted defendant of murder under the theory of felony murder, it could only return a true finding on the special circumstance if it further found that he either intended to kill or was a major participant and he acted with reckless indifference to human life. Failure to instruct that a nonkiller, under the felony-murder special-circumstance allegations, must (1) have personally had the intent to kill or (2) have been a major participant in the commission of the burglary or robbery and have acted with reckless indifference to human life is error: "In order to support a finding of special-circumstances murder, based on murder committed in the course of designated felonies, against an aider and abettor who is not the actual killer, the prosecution must show either that the aider and abettor had intent to kill (§ 190.2, subd. (c)) or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subd. (d).)" (*People v. Bustos* (1994) 23 Cal.App.4th 1747, 1753.)

9

Instead, the parties focus their argument on whether the error was harmless. The People argue that the court's federal constitutional error was harmless beyond a reasonable doubt and "no reasonable jury, properly instructed . . . would have failed to find" the missing element. (*People v. Osband* (1996) 13 Cal.4th 622, 682.) The People contend the overwhelming evidence demonstrated that defendant and Cisneros jointly coordinated and executed the robbery and murder and defendant intended to kill. According to the People, the surveillance videos show that defendant and Cisneros "acted as a choreographed team throughout the course of the robbery." Defendant responds that participating in a robbery is not evidence of intent to kill, or even of knowledge that the other participant intended to kill, citing *People v. Banks* (2015) 61 Cal.4th 788, 807.

Section 190.2, subdivision (d), provides in pertinent part that "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of [an enumerated] felony [including robbery,] which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole." Both parties rely heavily on the *Banks* case, which holds: "The statute thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*People v. Banks, supra,* 61 Cal.4th at p. 798.)

With respect to the mental aspect of culpability, section 190.2, subdivision (d), looks to whether a defendant knowingly engaged in a crime carrying a grave risk of

10

death.  (*People v. Banks, supra*, 61 Cal.4th at p. 801.)  He "must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create."  (*Ibid.*)  Thus, the special circumstance may be applied to those who "'subjectively appreciated that their acts were likely to result in the taking of innocent life.'"  (*Id.* at p. 802, quoting *Tison v. Arizona* (1987) 481 U.S. 137.)

We hold that, although the trial court erred by not giving CALCRIM No. 703 to the jury, the error was harmless:  "[W]hen a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman v. California* (1967) 386 U.S. 18, 24. [Citations.]  Under that test, an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict."  (*People v. Williams* (1997) 16 Cal.4th 635, 689.) Section 190.2 and CALCRIM No. 703 protect some aiders and abettors from sentences of death or life in prison without parole for felony murder convictions.  In this case, however, the videos and other evidence overwhelmingly showed defendant was a major participant who acted with reckless indifference to human life.

In *Banks*, the defendant Matthews was sentenced to life in prison without the possibility of parole.  Matthews was the getaway driver in an attempted armed robbery that resulted in a killing.  Matthews had helped plan the robbery with two other gang members.  (*People v. Banks, supra*, 61 Cal.4th at p. 796.)  However, Banks was not present at the attempted robbery and shooting and there was no evidence that he intended for the robbery to result in a killing.  (*Id.* at pp. 805, 807.)  The perpetrator's killing

11

appeared to be a spontaneous response to resistance from the victim. (*Id.* at pp. 795-796.) Under those facts, the California Supreme Court found there was insufficient evidence that Matthews was a major participant or that he acted with reckless indifference to human life for purposes of the special circumstance for an aider and abettor to felony murder under section 190.2, subdivision (d). (*Id.* at pp. 805-811.)

*Banks* described a spectrum of conduct that may make a defendant eligible for a special circumstance. (*People v. Banks, supra,* 61 Cal.4th at pp. 794, 811.) The pertinent considerations include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death? What did the defendant do after lethal force was used?" (*Id.* at p. 803.)

Applying the *Banks* factors, the present case did not involve an unexpected shooting or a defendant who was not present at the scene. Instead, defendant participated in the entire sequence of events from beginning to end. Before they entered the store, defendant knew Cisneros was armed and prone toward violence. Defendant wore a mask. The videos clearly showed defendant's active involvement. Defendant did not object, hesitate, or run before Cisneros shot Martinez, even though he was behind Cisneros most of the time. Instead, defendant instantly began searching the drawers for

12

money.  He showed no concern for Martinez as she was dying and fled without trying to help her.

The only opposing evidence was defendant's own testimony, which the jury rejected.  Furthermore, we reject defendant's argument that, because defendant had invited a coworker to go to lunch with Cisneros and him, there was evidence that defendant did not know that a robbery and a murder had been planned.  "Our task, then, is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'"  (*People v. Mil* (2012) 53 Cal.4th 400, 417, quoting *Neder v. United States* (1999) 527 U.S. 1, 19.)  Whatever defendant knew before he went to lunch, the evidence supports that by the time he entered the door of the business he knew a murder, or a grave risk of death, was in the offing.  No "rational juror, given proper instructions, could have had a reasonable doubt whether defendant was subjectively aware of a grave risk of death when he participated in this burglary and robbery."  (*Mil,* at p. 419.)  We conclude no evidence could rationally support defendant's claim of not knowing what might happen that day.

On appeal, defendant argues that he may have intended to commit robbery but the murder was unexpected.  However, if the court had instructed the jury with CALCRIM No. 703, that instruction was not consistent with the duress theory that defendant presented.  As a result, there is simply no possibility that the instruction would have resulted in a verdict more favorable to defendant.  The evidence against him was overwhelming, strong, and consistent.  Thus, the court's instructional error was harmless

13

beyond a reasonable doubt. For the same reasons, defendant has failed to show that the court abused its discretion by denying his motion for a new trial.

IV

INSTRUCTION ON NECESSITY

Defendant also argues the trial court erred by not giving sua sponte the jury instruction on necessity, an instruction he did not request. Defendant contends that the jury may have rejected his duress defense because Cisneros's alleged threat lacked immediacy. Therefore, an alternative instruction on necessity would have allowed the jury to find defendant's participation in the robbery was justified by his fear of future harm to himself or his family.

We disagree. "[T]he defense of necessity, or choice of evils, traditionally covered the situation where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils." (*U. S. v. Bailey* (1980) 444 U.S. 394, 410; *People v. Lovercamp* (1974) 43 Cal.App.3d 823, 831-832.) This defense is generally recognized when a defendant is charged with committing any criminal act except the taking of an innocent human life. (*People v. Pena* (1983) 149 Cal.App.3d Supp. 14, 22; *People v. Slack* (1989) 210 Cal.App.3d 937, 940-942.)

The defense of necessity involves six elements: (1) the act charged as criminal must have been done to prevent a significant evil; (2) there must have been no adequate alternative; (3) the harm caused must not be disproportionate to the harm avoided; (4) the accused must entertain a good-faith belief that his act was necessary to prevent the greater harm; (5) his belief must be objectively reasonable under all the circumstances;

14

and (6) the accused must not have substantially contributed to the creation of the emergency. (*People v. Pena, supra,* 149 Cal.App.3d Supp. at pp. 25-26; CALCRIM No. 3403.)

The necessity defense was inconsistent with defendant's theory of duress. In his trial testimony, defendant stated that Cisneros pointed the gun directly at him and he feared for his life. On appeal, he argues that he had time to consider his options and form the intent to commit the acts. Necessity is different from duress because, with duress, the immediacy of the threat negates an element of the crime—the intent to commit the act. (*People v. Heath* (1989) 207 Cal.App.3d 892, 901.) By contrast, the necessity defense contemplates a threat that gives the defendant time to consider alternative courses of conduct. (*Ibid.*) Thus, "[n]ecessity does not negate any element of the crime, but represents a public policy decision not to punish such an individual despite proof of the crime." (*Ibid.*) Defendant could not have argued that he both did and did not have the requisite intent. Indeed, "to require trial courts to ferret out all defenses that might possibly be shown by the evidence, even when inconsistent with the defendant's theory at trial, would not only place an undue burden on the trial courts but would also create a potential of prejudice to the defendant." (*People v. Barton* (1995) 12 Cal.4th 186, 197.)

Furthermore, defendant's evidence does not justify an instruction on necessity. A trial court's sua sponte duty to instruct on defenses not asserted by the defendant is limited. (*People v. Barton, supra,* 12 Cal.4th at p. 197.) A trial court has a sua sponte duty to instruct regarding a defense if substantial evidence supports the defense and it is not inconsistent with the defendant's theory of the case. (*People v. Montoya* (1994) 7

15

Cal.4th 1027, 1047.)  In deciding whether there is substantial evidence, the trial court does not make credibility determinations.  (*People v. Salas* (2006) 37 Cal.4th 967, 982.)  On appeal, the court determines whether the evidence was sufficient such that a reasonable jury, accepting all the evidence as true, could find the defendant's actions justified by necessity.  (*People v. Slack, supra*, 210 Cal.App.3d at p. 941.)

We conclude defendant did not meet his burden to present sufficient evidence to support the necessity defense.  In order to establish the necessity defense, there must be an emergency, a showing of imminent harm or a threat in the immediate future.  (*People v. Galambos* (2002) 104 Cal.App.4th 1147, 1163, fn. 7.)  Defendant presented no evidence of a significant and imminent evil; there was only evidence of a direct immediate threat against defendant that he would be immediately shot if he did not participate in the armed robbery and murder.  The jury rejected the duress defense.

There was no evidence of any other threatened harm.  Specifically, there was no evidence that Cisneros threatened to harm defendant or his family after the robbery or that defendant did not have adequate legal alternatives.  (*People v. Pena, supra,* 149 Cal.App.3d Supp. at pp. 25-26.)  Instead, the video showed that defendant entered the store after Cisneros, which gave him an opportunity to flee.  The robbery occurred at a strip mall in the middle of the day, giving defendant a chance to escape.  Thus, since defendant had the ability to flee, seek help, and call the police, he did not present evidence that there was no reasonable legal alternative to participating in an armed robbery and murder.  The necessity defense fails if there was a reasonable, legal

16

alternative to violating the law. (*People v. Galambos, supra,* 104 Cal.App.4th at p. 1164; *People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135.)

In addition, defendant presented no evidence that participating in the armed robbery created a lesser danger: "An important factor of the necessity defense involves the balancing of the harm to be avoided as opposed to the costs of the criminal conduct." (*People v. Heath, supra*, 207 Cal.App.3d at p. 901.) Several courts have found that the necessity defense is inappropriate when "its recognition would encourage rather than deter violence." (*People v. Kearns, supra*, 55 Cal.App.4th at p. 1135; *People v. McKinney* (1986) 187 Cal.App.3d 583, 587; *People v. Velasquez* (1984) 158 Cal.App.3d 418.)

In this case, the armed robbery created a far greater danger than any speculative threat to defendant's family. Defendant chose unhesitatingly to participate in an armed robbery and murder and now seeks to justify his decision. But, as other courts have recognized, permitting the necessity defense based on sheer speculation would encourage rather than deter violence.

Furthermore, even if defendant subjectively believed that armed robbery and murder were necessary, defendant presented no evidence that his belief was objectively reasonable. (*People v. Pena, supra*, 149 Cal.App.3d Supp. at pp. 25-26.) There was no evidence of a threat against defendant's family, defendant had the opportunity to flee, and his subjective and speculative fears did not outweigh the greater danger involved in armed robbery. Therefore, defendant failed to show that his belief in the need to commit these crimes was objectively reasonable.

17

Finally, any error was harmless beyond a reasonable doubt because the evidence of defendant's guilt was overwhelming. (*Chapman v. California, supra,* 386 U.S. at p. 24.) The evidence established defendant was financially strapped, suggesting a motive. The jury viewed and evaluated the crime videos, which showed defendant wore a mask and acted without hesitation. He showed no surprise or concern while he grabbed money from the drawers. He did not report the murder and he tried to deny his involvement. There was also no reason why Cisneros needed defendant's assistance to commit the crimes. He could easily have taken the money after killing the clerk. Because the jury rejected defendant's version and because overwhelming evidence foreclosed the necessity defense, any error was harmless.

V

IMPEACHMENT

Defendant testified that, in his initial interview with police, he did not claim Cisneros had threatened him because he was afraid that Cisneros might harm him or his family: "I couldn't open my mouth until I was sure that they had detained Mr. Cisneros." On cross-examination, he testified that he "would have told them everything" if the police had told him that Cisneros was already in custody. He also asserted that the police informed him "when we had finished the interview." The prosecutor rebutted defendant's testimony by having an officer testify that defendant was told about Cisneros's arrest during the course of the interview and not at the conclusion.

A prosecutor's use of a defendant's post-*Miranda* silence violates federal due process because "it is fundamentally unfair to use post-*Miranda* silence against the

18

defendant at trial in view of the implicit assurance contained in the *Miranda* warnings that exercise of the right of silence will not be penalized. [Citation.]" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 65; *Doyle v. Ohio* (1976) 426 U.S. 610, 618.) A prosecutor may not use the defendant's invocation of his right to remain silent or refusal to answer questions as evidence against him. (*People v. Champion* (2005) 134 Cal.App.4th 1440, 1448.)

However, "*Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." (*Anderson v. Charles* (1980) 447 U.S. 404, 408.) In addition, there is no violation of due process when the prosecutor's reference to defendant's postarrest silence was, in context, a fair response to defendant's claim or a fair comment on the evidence. (*People v. Champion, supra,* 134 Cal.App.4th at p. 1448.)

Defendant has not shown that the prosecution's impeachment of his trial testimony was wrong under *Doyle*. First, *Doyle* does not apply because defendant did not invoke his right to remain silent. (See *Anderson v. Charles, supra,* 447 U.S. at p. 409.) Instead, defendant testified about his police interview and the prosecutor used the impeachment evidence to rebut defendant's trial testimony. For that reason, defendant's "silence" was not used against him. Defendant has not shown that the prosecutor took unfair advantage of his exercise of his right to remain silent. (*People v. Champion, supra*, 134 Cal.App.4th at pp. 1450-1451.)

19

Finally, any error was harmless beyond a reasonable doubt.  (See *People v. Champion, supra*, 134 Cal.App.4th at p. 1453, applying *Chapman v. California, supra*, 386 U.S. at p. 24.)  As already discussed, the evidence of defendant's guilt was overwhelming.  He admitted his presence and participation, and his duress claim was inconsistent with all of the other evidence and extremely improbable.  Even without the officer's rebuttal testimony, defendant admitted that he was told of Cisneros's arrest at the end of the interview but he did not then tell "everything."  Even if the trial court erred by allowing the rebuttal testimony, the error was harmless beyond a reasonable doubt.

VI

EVIDENCE OF GUN

It was not an abuse of discretion to admit evidence about defendant and Cisneros handling a gun in April.  That evidence was clearly relevant because it showed that the relationship between the men involved guns.  It was not ineffective assistance of counsel not to object to that evidence.

Evidence is relevant when it has any tendency to "prove or disprove any disputed fact that is of consequence to the determination of the action."  (Evid. Code, § 210.)  Nonetheless, the court may, in its discretion, "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "'Prejudice' in [Evidence Code] section 352 does not refer simply to evidence that is damaging to the defendant.  Instead, '"[t]he 'prejudice' referred to in Evidence Code section 352 applies to evidence which

20

uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*."' [Citation.]" (*People v. Smith* (2005) 35 Cal.4th 334, 357.)

A trial court has wide discretion in determining the relevance of evidence and whether the probative value of evidence outweighs its possible prejudicial effect. (*People v. Chatman* (2006) 38 Cal.4th 344, 371; *People v. Sassounian* (1986) 182 Cal.App.3d 361, 402.) "An appellate tribunal is not authorized to substitute its judgment for that of the trial judge." (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65.) "[D]iscretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered." (*Ibid.*)

The trial court properly exercised its discretion when it admitted the evidence of the April gun incident. The trial court held that the incident was "still relevant to the two of them acting together with a gun in November" in spite of who actually handled the gun. The relationship between defendant and Cisneros was highly relevant, particularly since defendant claimed that Cisneros suddenly and unexpectedly ordered him at gunpoint to participate in a robbery. Regardless of who brought the gun to work, the two clearly shared an interest in guns. Thus, this evidence was relevant to defendant's relationship with Cisneros, his knowledge of Cisneros's interests and actions, and the absence of any mistake by defendant. (Evid. Code, § 1101, subds. (b) & (c).) Although defendant was not the shooter, that fact has little bearing on whether he and Cisneros handled guns together, evidence which tended to rebut defendant's claim that he was an

21

unwilling participant in the crimes. The trial court's decision did not exceed the bounds of reason.

Furthermore, defendant forfeited his argument that the prior gun incident was unduly prejudicial because he failed to raise that objection in the trial court. (*People v. Champion* (1995) 9 Cal.4th 879, 918, overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860.) Here, defendant only raised a relevance objection to the prior gun incident evidence. He did not object under Evidence Code sections 352 or 1101, nor did he raise a due process objection. Therefore, he has forfeited these claims on appeal.

Notwithstanding forfeiture, defense counsel may have had a reasonable, tactical purpose for not objecting. The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee criminal defendants the right to effective assistance of counsel. (*People v. Bonin* (1989) 47 Cal.3d 808, 833.) The burden of proving ineffective assistance of trial counsel lies with the defendant who challenges the judgment. (*People v. Haskett* (1990) 52 Cal.3d 210, 248.) Defendant must demonstrate deficient performance as well as prejudice under the federal and state Constitutions. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-695; *People v. Osband, supra,* 13 Cal.4th at p. 700.)

We presume "that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703.) Defendant must show trial counsel's representation fell "below an objective standard of reasonableness." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) If

22

the record on appeal does not contain an explanation for the challenged action or omission, the reviewing court must reject a claim of deficient performance unless counsel failed to provide an explanation when asked or there could be no satisfactory explanation for counsel's conduct. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266; *People v. Osband, supra*, 13 Cal.4th at pp. 700-701.)

Here, defense counsel may have recognized that, by arguing that the evidence was irrelevant, he presented his strongest argument and maintained credibility with the court. In addition, since this incident, which occurred over six months earlier, was the only other evidence of defendant handling a gun, counsel could have portrayed the prosecutor as "grasping at straws" and the evidence would do minimal damage. Therefore, defendant has not shown that counsel was deficient for not raising a prejudice objection.

Furthermore, the gun incident evidence was not unduly prejudicial. (*People v. Davis* (1995) 10 Cal.4th 463, 515-516.) The defendant must show a "reasonable probability that counsel's omission resulted in a less favorable verdict" (*People v. Wash* (1993) 6 Cal.4th 215, 271) or "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington, supra,* 466 U.S. at p. 686.) "'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'" (*In re Fields* (1990) 51 Cal.3d 1063, 1079.)

The gun evidence merely showed that defendant and Cisneros had previously handled a gun together at work. The evidence did not involve any gun use, violence, or

threats. The evidence did not "'"uniquely tend[] to evoke an emotional bias against the defendant."'" (*People v. Smith, supra*, 35 Cal.4th at p. 357.)

Errors in admitting evidence are harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 unless there is a reasonable probability that the defendant would have received a more favorable result without the error. (*People v. Alcala* (1992) 4 Cal.4th 742, 770.) Here, defendant has not shown any probability of a more favorable result without this evidence. The evidence against defendant was overwhelming, and the only issue in dispute was whether defendant committed the crime under duress, regardless of whether the jury knew defendant handled a gun six months before. Defendant has not shown a reasonable probability of a different result without the evidence.

VII

OTHER EVIDENCE

In his telephone conversation to his wife while in jail, defendant tried to explain what had happened. In the translated version, he stated: "so since my face is not uncovered, they doesn't [*sic*] have much. They have me here because *he said it was me*, but let him put — let him — as deep as he can in my case, so the videos of everyone, everything — everything, so that they see that, take away the two charges. [Emphasis added.]" After a bench conference, the court told the jury, "[T]he statements that were just read to you, there are statements that [defendant] makes referring to what other people said. Those statements are not being offered for truth of those statements, only as to defendant's state of mind concerning those statements. Unless he specifically adopts them as his statements." It is not clear who defendant means in the phrase "he said it was

24

me." Nevertheless, defendant claims that "he" referred to Cisneros, that the statement was inadmissible hearsay, that the statement violated the Confrontation Clause, and that the court's instruction not to consider the statement for the truth of the matter was inadequate.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200.) Out-of-court statements that are not offered for their truth are not hearsay under California law and do not violate the confrontation clause. (*People v. Ervine* (2009) 47 Cal.4th 745, 775-776; *Crawford v. Washington* (2004) 541 U.S. 36, 60, fn. 9.) Statements that are "admitted to supply meaning to defendant's conduct or silence" in the face of accusatory statements, rather than for their truth, do not constitute inadmissible hearsay. (*People v. Combs, supra*, 34 Cal.4th at p. 842; Evid. Code, § 1221.) These adoptive admissions are admissible when (1) the party has knowledge of the content of another's hearsay statement, and (2) the party uses words or conduct indicating adoption or belief in the truth of the statement. (*Combs,* at p. 843.)

Trial court rulings regarding the admissibility of evidence are reviewed for abuse of discretion. (*People v. Alvarez* (1996) 14 Cal.4th 155, 203.) This court independently reviews a trial court's determination that evidence did not violate the defendant's rights under the Confrontation Clause. (*People v. Johnson* (2007) 150 Cal.App.4th 1467, 1478.)

The trial court did not abuse its discretion by admitting defendant's recitation of the accusation against him by an unidentified person. The purpose of this evidence was

25

not to prove who had accused defendant.  The issue was how defendant responded to that accusation.  As the prosecutor argued, "[I]t would be an implied admission."  Rather than denying his presence at the scene of the crime, defendant acknowledged the truth of the statement, and it became an adoptive admission.  (*People v. Combs, supra,* 34 Cal.4th at p. 843.)  In addition, because the statement was not admitted for its truth, it did not violate the Confrontation Clause.  (*People v. Ervine, supra,* 47 Cal.4th at p. 776.)

Even if the court erred by admitting the statement, the error was harmless under any standard.  If admission of hearsay statements violated a state statute alone, this court applies the standard articulated in *People v. Watson, supra,* 46 Cal.2d at page 836, and reverses only if there is a reasonable probability of a result more favorable to the defendant in the absence of the error.  (*People v. Duarte* (2000) 24 Cal.4th 603, 618-619.)  If the error violated defendant's Confrontation Clause rights, this court determines whether the error was harmless beyond a reasonable doubt.  (*Chapman v. California, supra,* 386 U.S. at p. 24.)

Defendant's defense was duress, and he admitted that he was the other person in the video.  Therefore, any statement that "he said it was me," regardless of who "he" was, could not have had any impact on the verdict.  The statement had no bearing on whether defendant was acting under duress.  The video itself provided overwhelming evidence that defendant willingly participated in the crimes.  Any error in admitting this statement was harmless under any standard.

Defendant also objects to the admission of defendant's false name, Johan Samayoa, because the jurors might have speculated that he was not a legal citizen.  The

trial court permitted those witnesses who knew defendant by that name to identify him as such. We hold defendant has not shown that the trial court abused its discretion or that he was deprived of a fair trial and that any error was harmless.

The trial court properly exercised its discretion by admitting evidence of defendant's false name for purposes of identification. Many of the relevant witnesses in the trial knew defendant as Johan Samayoa. In addition, as the prosecutor argued, defendant's character witnesses did not know him well enough to know his real name, which was relevant to their credibility. The trial court also properly exercised its discretion by finding that the relevance of defendant's false name was not "substantially outweighed" by the danger of undue prejudice. (See Evid. Code, § 352.) Except that he required an interpreter, whether defendant was known as Samayoa or Mendez, both Hispanic surnames, there was nothing in the record one way or the other about defendant's status as a citizen.

In any event, to prove a deprivation of federal due process rights, defendant "must satisfy a high constitutional standard to show that the erroneous admission of evidence resulted in an unfair trial." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229.) There was no direct evidence regarding defendant's citizenship and his false surname was mentioned only twice in identifying him. Defendant failed to show that admission of his false last name rendered his trial so arbitrary and fundamentally unfair that it violated federal due process. Any error was also harmless unless there is a reasonable probability that the defendant would have received a more favorable result without the error.

27

(*People v. Alcala, supra*, 4 Cal.4th at p. 770.)  The evidence of defendant's guilt was overwhelming.  His false surname had no bearing on the verdict.

## VIII

## DISPOSITION

We reject all defendant's claims of prejudicial error.  Therefore, we reject his contention of cumulative error as well.  (*People v. Anderson* (2001) 25 Cal.4th 543, 606.)

We agree with the parties that the unauthorized parole revocation restitution fine should be stricken.  (*People v. Carr* (2010) 190 Cal.App.4th 475, 482.)  We order the clerk of the superior court to prepare an amended abstract of judgment to be forwarded to the Department of Corrections and Rehabilitation.  In all other respects, we affirm the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:

McKINSTER

Acting P. J.

MILLER

J.

28